Ms. Taylor, Ms. Taylor, please. One note at, okay, thanks. Good morning, Your Honors, Charlotte Taylor on behalf of the Pallant of Guardian. You need to pull that microphone a little closer, if you would, please, and raise it up. Does the podium rise or just the microphone? Is that better? Yes, that's much better, thank you. Good morning. The simplest way to resolve this case is under subsection 2 of the effects of determination provision in the No Surprises Act. That subsection provides that a court can review and vacate an IDR award procured by fraud or undue means. The insurers agree that the statutory text is clear on this point, as they must. They only argue that the providers did not adequately plead fraud. But an insurer's QPA, which represents the median contracted rate for air ambulance services, is a central input to the IDR process. And the providers alleged that both Kaiser and Aetna engaged in schemes to misrepresent their QPAs, citing falsely low numbers to the IDR entity, that then induced the IDR entity to credit their offers as more generous than they really were. The district court dispensed with these allegations in a single sentence. It did not clarify the applicable pleading standard. It did not directly acknowledge the nature of the misrepresentation alleged. And it did not explain why such a scheme falls short of fraud or undue means. If an insurer affirmatively misrepresenting its QPA is not fraud, then it is difficult to imagine what would count in the No Surprises Act context. This court should clarify that the facts alleged are sufficient to state a claim under subsection 2. So there are three common points about all of the schemes alleged. Each insurer misrepresented its QPA to the IDRE, citing a falsely low number. The IDRE then relied on that falsely low number to award the win to the insurer. And each insurer concealed information about its QPA from the providers that would have allowed the providers to make appropriate arguments to the IDR entity about the plausibility of the QPA. The only difference among the schemes is the specifics of how each insurer misled the providers. We can start with the Kaiser 2 QPA scheme. Kaiser actually certified that a higher number was its QPA when it made its initial payment to the relevant provider. Then, when it made its submission to the IDR entity, which the provider does not see in real time, it then certified a lower number was the QPA. And then, in each case, the IDR entity relied on the lower number and chose the insurer's offer. So imagine, for example, that the actual QPA for a particular transport would have been $50,000. If the insurer tells the provider up front, our QPA is $70,000, and then tells the IDR entity that the QPA is $30,000, that scheme is going to work a misrepresentation that will mislead on two fronts. Because, first, the relevant provider will think, when it's coming up with its offer for the baseball-style arbitration, it will think that $70,000 is a reasonable ballpark to be in because that's what the QPA is that has been provided to them. So they will make an offer in reliance on that that will then not appear as reasonable as the provider had reason to believe it was when it gets to the IDR entity. Then, at the other end, if a low QPA has been provided to the IDR entity, the IDR entity will then assume that the provider's offer is even farther out of line and that the insurer has made an overgenerous, if anything, offer to the IDR entity. So, with respect to the two-QPA scheme, we alleged a pattern of that happening repeatedly. In fact, the QPAs that were provided to the IDR entities in the context of, you know, were routinely about half of the amount that Kaiser had represented was the QPA in its initial disclosures to the relevant entity. Now, counsel, is the premise of this argument that, under subsection 2, we are not importing sort of all the fraud precedents under the FAA? I know you make an argument in your briefing that, no, no, we don't import that merely because of the reference. So is that a premise of your argument? In other words, do you lose if we disagree with you on that point? No, we do not lose if you import the FAA case law, and I think that's an important point that this Court could clarify in its opinion. Now, we do think that there are some textual differences that are worth paying close attention to in the statutory scheme and that it may not be automatic that you import all the FAA case law. Oh, I mean, it's hard. Frankly, look, it's hard for me. You've made a very sophisticated argument here, and I appreciate that. It's hard for me to understand why we wouldn't import that since it seems like it's not just a reference to the FAA. It's sort of saying these cases, if there are these cases like the ones in the FAA and it's a direct reference to those particular sections, why wouldn't we just take the FAA wholesale? If this Court does take the FAA case law, we still believe that we win, and I'd like to walk through that. Okay, please. But I would just note that we simply wanted to draw attention to the fact that, first of all, there are statutes that totally import all of Section 10 of the FAA, and that's not what happened here. Congress seemed to go out of its way to just— What's the language? It's like cases described in or something like that? Yes, and then it just lists those subsections 1 through 4 instead of Section 10A. Okay. And also there are some meaningful procedural differences that make it not automatic to think that Congress would have wanted to import the FAA. But just to get back to your actual question, I don't think that the FAA case law, if you do import it, that that means we lose because there's nothing—and again, this is the type of analysis that the District Court failed to do. The FAA does not require sort of super fraud. It is, of course, hard to achieve vacater of an arbitration award, but that's not because a statutory term like fraud means something other than the normal elements that go along with that. And so we would—if you look at, for example, the 11th Circus decision in Bonar, that's a case where there was an expert witness who had affirmatively misrepresented his credentials, just made up degrees that he claimed to have that he didn't have. And the 11th Circuit said, well, that is fraud. It's an affirmative misrepresentation about a material fact because he was testifying with respect to a damages award. That was really the only issue there in arbitration. And it wasn't discoverable in due diligence with due diligence. So it's not—I mean, again, that's just—that's a very standard definition of fraud. Undue means often is interpreted sort of side-by-side with fraud, but it means bad faith. And if somebody is making an affirmative fraudulent misrepresentation, that will constitute undue means. And there's—we cite the American Postal Workers case from the D.C. Circuit on that point. Diligence, I think, is an element that often is an obstacle to recovery under the FAA case law, and this court's decision in Morgan Keegan is an example of that. But I think the reason why—diligence has to be interpreted as due diligence, right? It's not that you exercise, again, sort of superhuman powers to uncover every possible fact that might be out there in the world. It's using the tools at your disposal to make the arguments in the context of the arbitration that you could have made if you had been diligent and uncovered that. So in Morgan Keegan, this court held, well, their—you know, the allegation was that a particular witness had been sort of cooking the numbers in his testimony, but those numbers had actually been provided in significant part to that witness by the party then claiming fraud. So this court held you had the opportunity to evaluate that, and you failed to discover it, and so you can't come after the facts under the FAA and try to get the award vacated. But here, the providers asked in every single instance, you know, please provide additional disclosure about your QPA, and we had no other tools to use. There's no civil discovery in this IDR process. And with the concealment and the failure to provide those disclosures, we would satisfy due diligence. And again, this is an analysis that I think it would be helpful for this court to walk through to clarify how to apply the FAA case law in the context of the NSA IDRs, if that's how this court does read the statute. So under—oh, sorry. Sorry, Your Honor. What do you think? So, for example, under the applicable regulations and statute, we're entitled to know whether the insurers are using a database. So the way that the QPA is calculated, if you don't have a requisite number of in-network agreements to form the basis of the QPA, then you can consult an external database. That's the type of information that we would routinely—that we're entitled to ask for. You can also ask for information, for example, about whether the QPA includes incentive or bonus payments. And these are technical issues, but they do allow the parties, like the providers, to assess what is the basis for this QPA and then to make arguments to the IDR entity about whether it's reasonable to rely on the QPA that relies on particular— for example, a particular third-party database that's been identified. Or to say, well, given the bonus structure that's in that, you should discount the QPA in the following manner and rely on our alternative market data or whatever it is that we might be putting forward in our submission. So the No Surprises Act is fairly new. What are the areas of law, if there are any, that you think it would be helpful for us to clarify in reaching our decision, whichever way we go in this case? So first, taking—I know we have two appeals this morning, and taking them together, we think that it's crucial that this Court clarify that subsection 1 of the effects of determination provision provides the ability to go to court and enforce IDR awards, that there is a right of action at a minimum to enforce unpaid awards. And then with respect to subsection 2, to clarify that even to the extent that the FAA is referenced, that doesn't mean that there's a sort of—you simply recite FAA as sort of a talismanic term and then the party claiming, seeking vacant or loses, that you have to actually walk through the elements of fraud or undue means in this case and evaluate how that case law should be applied in the context of the NSA IDR, which is distinct from arbitration in a few meaningful respects, but most obviously and significantly, there's just not anything resembling civil disclosure, exchange of adversary—civil discovery, exchange of adversary briefing, and all of those, you know, mechanisms that, though arbitration is, you know, ideally meant to be more streamlined than civil litigation, it is actually far more robust in terms of the procedures that are available than NSA IDR. I think that—I'll be frank with you. I think the subsection 1 point is a genuinely difficult point, for me at least, and for both sides. I understand that your argument wants to give some meaning to that section, and we have to read statutes to have—so that they have meaning, and yet subsection 2 seems to cabin judicial review only in particular instances, and so how can I give meaning to subsection 1 with that sort of redlining, subsection 2's limitation on judicial review? So at the risk of—again, I don't want to, you know— I see all these issues as interrelated, but I don't want to, you know, get out ahead in terms of, you know, the presentation of the arguments, but I do think that it's important. Judicial review, especially, you know, in the context of where you have an administrative process here, has a particular meaning that is distinct from when something is binding. So if you just take the example, let's say, of a FERC, you know, there's a FERC proceeding about whether a particular rate in a pipeline's tariff is just and reasonable. You can have a whole, you know, FERC proceeding. You get to the end, FERC says this is just and reasonable, then that's the tariff, and that binds the parties. There might separately be judicial review. You would have to go to the appropriate court of appeals within the jurisdictional 60-day window and so forth, and you might, you know, you might miss the window, or, you know, you might fail in your arguments that the agency got it wrong, but those are simply two separate, conceptually separate inquiries, and the same, in fact, goes with the district court judgment, right? The district court judgment is binding. There are procedures like Rule 60 sets forth where a district court judgment can be set aside if one of the grounds there is met. That's totally separate from appellate review of that district court judgment. In fact, you can't bring those sort of Rule 60 arguments on appeal from a district court judgment. So I think if you keep that sort of basic bifurcation in mind, the limitations on judicial review under Subsection 2 can be given their full meaning as long as judicial review is what we're talking about, bearing in mind that Subsection 1 goes to when an IDR award is binding, as its plain terms indicate. But you think, let's assume there is also judicial review under Subsection 1. Are you saying that the standard absence of a fraudulent claim or evidence of misrepresentation is different from the four parts outlined in Subsection 2? Is that a different standard of judicial review? So I think there are some textual differences, right? Subsection 2 obviously incorporates a number of grounds that are just not relevant under Subsection 1. Yes. Arbitrators. Yeah. Those are not at issue here. So with respect to misrepresentation or fraudulent misrepresentation claims, to the extent that there's daylight, it's not going to be practically hugely significant in a case like this because the regulations, again, under Subsection 1 do require that a misrepresentation be both intentional and material. And so, again, this is something that the court could clarify in walking through the statute and explaining, but an intentional material misrepresentation is largely going to also satisfy defraud under Subsection 2. Okay. But, again, there are some textual differences between the two, and I don't want to stand here and say that there's never going to be a case where there might be a difference in practical application, but we don't think it's hugely significant on the facts here. All right. Thank you, Ms. Taylor. You've saved time for rebuttal. Thank you. Mr. Keshevarzy. Good morning, Your Honors. Mo Keshevarzy for Kaiser Foundation Health Plan. Good morning, and may it please the Court. Your Honors, Congress enacted the NSA to end a market imbalance and to protect consumers from balance billing, a practice that air ambulance providers for years used as leverage to force health plans to pay excessive rates. And to address disputes that it knew would arise once the new law went into effect, Congress borrowed from the Federal Arbitration Act to create a dispute resolution process that's supposed to be quick, efficient, and with access to courts prohibited except in the most extraordinary circumstances. Let me ask you a question. Was the IDR entity before this situation? Yes, Your Honor, before and after. What? Before and after. Yes, Your Honor. That's my understanding, Your Honor. That evidence is not in the record, but both before and after. Yes, Your Honor, Kaiser has. Judge Duncan, I want to start by answering a question that you pose in terms of the text of the statute. And I think this is a really important place to begin and perhaps end the analysis, as this Court has noted multiple times. Judge Smith, as you noted in the Sombrano decision, that in interpreting a statute, the Court begins and, if possible, ends with the text of the statute. And when we believe that the text gives this Court what it needs to make the decision. And Subclause 2 says, after saying that a determination of a certified IDR entity follows with Subclause 2, shall not be subject to review. Shall not be subject to review. Whatever ambiguity there may be in the law, that much we know is true. That shall not be subject to review is clear. Except in a case described in any of paragraphs 1 through 4 of Section 10A of Title IX. It doesn't say 10A, and it doesn't say 10A 1 through 4. What it says is paragraphs 1 through 4 of Section 10A. The reason that's important, Your Honors, is this. Appellants would have this Court pull some requirements or some rights under the FAA into this statute, but not others. For example, reading this text, the district court would not have the ability to vacate an award, would not have the ability to remand back for a new arbitration, because that's not something that was incorporated in this text. Our belief, Your Honor, as we have said in our papers, is that when Congress referenced the FAA and these sections, it brought with it all the body of law that underlies the FAA, including additional requirements that a party must meet to establish the basis for vacating. For me, to be frank, again, it's a strong argument you're making because of the text of the statute. However, what do I do? What role is subsection 1 playing in the statutory scheme, if I agree with you? Your Honor, there are at least two ways the Court could harmonize the two sections to the extent you believe there is disharmony between the two subclauses. Number one, you could interpret subclause 1 as saying fraud, if it rises to the same level as the type of fraud, that would be sufficient to vacate an arbitration award under the FAA. If you interpret it that way, that would be a way to harmonize it. Wouldn't that make it superfluous? Perhaps, Your Honor, but the Court must give power to the phrase and must honor the phrase, shall not be subject to review, and that is pretty clear. The other way to harmonize the two provisions, Your Honor, would be to conclude that subclause 1 creates a right without a remedy. I'll give you an example. If there is an award that's been procured that either the provider or the health plan tries to enforce, if there has been a misrepresentation, that could be a basis for it not be binding, but a court would not decide that it would be left to CMS or the secretaries to make that determination. The law is full of provisions giving CMS the power to enforce the law, to interpret the law, and to police QPAs and other aspects of the law. And it's entirely not just plausible, but in fact happens, that both the health plan and the provider would be in a position to want to enforce an award. Of course, the provider would want to enforce an award when there is an underpayment. But there are many circumstances where the IDRE's determination results in an overpayment, meaning now the provider has to pay money back to the health plan. In fact, Your Honor, so common are examples of overpayments that the stock language in the IDRE awards at the bottom says, we've made this decision. If as a result of this decision there's an underpayment, health plan, you need to pay the provider. And if as a result of this decision there's an overpayment, you, provider, must pay the health plan. You can see those at pages 131 to 158 of the record, which are the IDREs that we submitted to the district court with our request for judicial notice. So, Your Honor, we do not believe that fraud has been alleged sufficient to meet the requirements of the Federal Arbitration Act, and I want to address that issue. That was going to be my next question. They say that even if we import FAA fraud standards, they can still prevail, so what's your response to that? Your Honor, I'm going to address the specific allegations, but before I do, the case law, including the cases they have cited, gives the court examples of what type of fraud is sufficient to vacate an arbitration award. And when evaluating a claim of fraud sufficient to vacate an arbitration award, we're doing so, cases tell us, against the backdrop of deference to the arbitrator, that it must be an extraordinary and extreme case for the court to vacate the arbitration award. Add to that the fact that in this circumstance, Congress has made it very clear that they want the IDR process to be quick, efficient, and they wanted to limit access to the courts. The process was not supposed to be easy. They were trying to make it difficult. There's a cooling off period. You can't arbitrate multiple times against the same entity. You can't batch more than a certain number of claims. All of these suggest, and Congress has said so in the legislative history, that what they wanted was to make it so uncomfortable that the parties come to an agreement. Let me ask you, what was the significance of the typographical error you said you made, and why did you do it? Well, Your Honor, let me answer that question directly. And this goes to why the evidence of fraud here, the allegations of fraud, are not plausible. The fraud that they allege, there's no allegation in the complaint that the QPA represented to the IDR entity was false. There's no allegation. The allegation is that there's inconsistent QPAs. But that does not, the conclusion that that was fraud is not plausible. And here is why. It wouldn't make sense for Kaiser to report one QPA to the provider and one to the IDR entity. Why? It is bound to come out. There is no prohibition against the IDR entity not referencing the QPA. The law says they must consider the QPA. So, of course, anyone submitting the QPA to the entity knows or assumes that they're going to mention it. It doesn't make sense. It's not plausible to have a fraudulent scheme where you're telling one entity one number, another another number, and you don't expect it to come out. It's bound to come out. And, Your Honor, the specific facts here, there are six claims, six bills. For three of them, they say Kaiser didn't submit the QPA. For three of them, Kaiser did. The high-dollar ones are not the ones where Kaiser allegedly committed fraud. In fact, two of the highest-dollar ones are the ones where there is no fraud alleged with respect to them. And on the same day, April 25, 2022, they say Kaiser submitted two claims. One of them, it said it was the QPA. The other one, it didn't say. That type of inconsistency, we submit respectfully, given the totality of the circumstances, shows that what happened here wasn't a fraudulent scheme, and it's implausible that that would have been fraud, but rather explained that there is a more innocent, innocuous explanation that it was a typo or a mistake. Your time has expired now, Mr. Kishiraji. Okay. Well, thank you very much, Your Honors. Fran? Good morning, Your Honors. Katherine Strahan, IV of Appley, Aetna Health. May it please the Court. Your Honors, I would like to focus specifically on the claims against Aetna, which relates to one IDR award. As to the complaint against Aetna, Guardian failed to sufficiently allege facts that would establish a claim for fraud, undue means, or even ordinary misrepresentation under Rule 9b. And Guardian agrees that Rule 9b is a pleading standard here. That means that the dismissal of the claims against Aetna should be affirmed regardless of what standard applies for judicial review. Now, that said, the district court did correctly determine that the only avenue for challenging an IDR award is through one of the four narrow exceptions in the FAA Section 10a based upon the exclusionary language in the NSA. And this court should hold the same, because if plaintiffs or providers were to challenge the IDR awards based on these scant allegations, it would open the floodgates for the federal courts to review all of the hundreds of thousands of IDR awards that are issued. Your Honor, under the FAA standards, what more would be would be something that would be absolutely fraudulent, fraud submitted such that the claim itself was procured by fraud. As an example, excuse me, the award was procured by fraud. As an example, if a provider were representing that the claim was subject to the NSA such that, for example, he was an out-of-network provider when, in fact, he was not, or if there were claims that were submitted in the arbitration based upon false facts, such as, for example, there is no type of review, if you will, or regulation of the market data that the plaintiffs rely on here. But the QPA, Your Honor, is regulated by Medicare. It's regulated by CMS. And that is something that the providers do have the ability to complain to CMS if they do believe that the QPA is low. And here, Your Honors, stripping away all of the allegations from the other defendants, what's left against Aetna, Your Honors, is that Aetna's QPA submitted to the arbitrator was improbably low. There is no allegation that Aetna calculated its QPA one way and then told the arbitrator, or anyone else for that matter, that it was something different. If I can understand your point, are you saying that because CMS regulates QPAs, there can never be corruption, fraud, or undue means with respect to a QPA? Your Honor, as to the calculation of the QPA, that's what I'm submitting. Because the calculation is what is regulated by CMS. So that is the focus of what the complainant's complaint is here against Aetna. In paragraph 35 of their complaint, they say specifically, Aetna, quote, misrepresented the facts by submitting a purported QPA that was not properly calculated under federal law. And that's the crucial point with respect to the claims against Aetna. They're only complaining about speculation of Aetna's calculation of the QPA. And frankly, that speculation, Your Honor, is based upon undefined, unspecified market data. And even under this Court's precedent, there is a very similar scenario. It's cited in Aetna's brief in U.S. v. Columbia HCA 125 Fed 3rd 899 from 1997, where this Court held that allegations by the relator, quote, in reasonable probability based on statistical studies performed by the government and others, that approximately 40% of claims submitted to Medicare were for services that were not medically necessary. In that case, this Court held that that failed to meet Rule 9b's pleading standards. And you'll note the remarkable similarities between the plaintiff's allegation here of improbably low QPA based upon unspecified market data and the, quote, reasonable probability based upon statistical studies in that case. The Court noted that there were no specifics about the statistical studies to show that it applied to the defendants in any way and that it would rise to a plausible claim for relief under fraud standards. The same is true here. And as, Your Honor, for the CMS audit report that was referenced in the briefing on appeal by Guardian, that was not in their complaint. It was not in the record below. It has nothing to do with this one claim upon which the plaintiff sues Aetna here. But I would like to note, Your Honors, that even relying or trying to rely on that CMS audit in the briefing by Guardian, that in footnote 14, they allude to the fact that the audit reflects that of five claims addressed. Aetna's calculations overstated the properly calculated QPA as often as it understated the properly calculated QPA. So while Guardian focuses on the latter scenario, the QPA was just as likely to have been too high in this scenario as it would have been to be improbably low based upon the audit that Guardian is trying to improperly rely on now. And so even if the audit were considered, Your Honors, as part of the complaint, nothing there assists Guardian in a plausible claim for relief against Aetna. And so, Your Honors, we will rely on our briefs for the remaining points, but we do also believe that subsection 2 is the only means for invoking this court's jurisdiction and that the district court's dismissal of Aetna should be affirmed. Thank you, Your Honors. Thank you, Ms. Drahan. Mr. Lanza? Thank you, Your Honor. I'm Joe Lanza. I represent Medical Evaluators of Texas, the Apley Cross Appellate. In this matter, as the court knows, they are the certified independent dispute resolution entity that decided on one of two figures in this baseball-style arbitration. The Congress wanted to create a quick, easy, and inexpensive way of settling out-of-network provider disputes, and here I am standing before you today. It was neither quick, inexpensive, or easy to get here. Congressional intent has been thwarted. The surest way, or the surest step, the court can take to getting back the congressional intent under the Act would be to extend absolute immunity or qualified immunity to the certified independent dispute resolution entities in this case. They tick all the boxes to be eligible for absolute immunity. Excuse me. Sorry if my voice is a bit rough. They're decision-makers. They decide between two competing interests based on evidence submitted to them under the Act, and they render a decision. The types of decisions they render are, unfortunately, the types of decisions that are sometimes subject to requerimentary lawsuits against the decision-makers. And finally, the Act itself contains, within its framework, protections against possible abuse, constitutional abuses by the independent dispute resolution entity. They have to be certified, which means they undergo a rigorous vetting process by CMS and HHS. They must demonstrate that they are qualified. They have the medical, legal, or other expertise to render decisions. They have to demonstrate that they have no ties to an insurance company, a group health insurance plan, or a health care provider. They have to demonstrate that they have fiscal responsibility, that they're able to protect protected health information of the patients involved in the process, and they're subject to recertification every five years, audits, and if HHS or CMS finds that they have engaged in a pattern of noncompliance with the statute, their certification can be revoked. If these types of factors seem familiar to the Court, they should. This Court decided 40 years ago in Austin Municipal Investments Incorporated versus the National Association of Securities Dealers who decided these three factors that we just discussed are the type of factors indicative of entitling a decision-maker to absolute immunity. Let me ask you if your client compared the rates that Aetna and Kaiser submitted to your client. Did they compare those rates to the rates submitted to Guardian Flight? I'm having a little trouble hearing, Your Honor. I apologize. Because this is so loud, I always move it away. Did your client compare the rates that Aetna and Kaiser submitted to it to the rates that they submitted to Guardian Flight, Reach, and Cascade? Comparable to who, Your Honor? What? Is my client comparable to what entity? I'm having a little trouble understanding that. Compare the rates that they received from Aetna. Did they compare the rates that Aetna provided to Guardian Flight? They have no connection to Guardian Flight or the other air service. Mr. Sherman is asking if the rates that were submitted to you, to your client, MET, did your client compare those rates to the QPAs that were submitted by the insurance companies to Guardian, I guess in the negotiation process? I'm sure they did compare the rates, Your Honor. That's part of their client function.  Yes, my client. That's what a certified independent dispute resolution entity does. It compares the rates. It considers all the evidence, including the QPA that is submitted to it, and makes a decision. The fact that maybe it makes an error when it makes that decision by applying the wrong law or considering the wrong evidence doesn't mean they've acted outside the scope of their authority. They've made a mistake. And here again, arbitrators, which we compare them to, are immune from suits even where they apply the wrong law or consider the wrong evidence. I see I'm almost out of time. To wrap up, I think to effectuate the congressional intent, providing absolute immunity to the arbitrators, the CIDREs in this case, helps put us back on track. Otherwise, we won't have any CRDs left because they'll withdraw due to the legal expenses. Thank you for your time, Your Honor. Thank you, Mr. Lanza. Ms. Taylor for rebuttal. Thank you, Your Honors. First, I would just note that I didn't hear any textual reason not to read subsection 1 as providing the misrepresentation language at a minimum as providing for a defense in an action to enforce the IDR determination. I did want to talk briefly about remedies with respect to Matt's arguments and also something that Kaiser stated. Kaiser asserted that I believe that we need the FAA to be totally incorporated in order to have a vacater and remand remedy. We don't believe that's correct. Courts have an inherent authority to vacate and remand and, in fact, did so with arbitral awards before the FAA existed. We named Matt because this is a very unique scheme. It has a lot of attributes of arbitration, but it's also conducted under the auspices of a federal agency. So there are a few different ways that you could style an action like that. You could name the administrative agency, effectively, that conducted the rate-making proceeding, which would be the IDR entity. You could treat it like arbitration and name your adverse party, which we also did. I suppose we could also have named CMS, which we did not do. But our basic, what we would like to have is a remedy. So if this court holds that it's possible for federal district courts to vacate and remand IDR determinations for another go before the IDR entity, then we don't insist that IDR entities need to be parties at all. You don't need MET to be a party at that point. Pardon? You don't need MET to be a party at that point. Correct, exactly. That's what I thought. Yes, that's right. So I also wanted to just clarify, Aetna has argued that all that's at stake here is a miscalculation of the QPA, but just to be clear, we did allege, with respect to Kaiser and Aetna, that there was an affirmative misrepresentation. There's no textual basis for carving out misrepresentations about insurers' QPA from the statute. In fact, that's a highly material input into the IDR determination. What's your response to that? Their response to that is, well, those are regulated by CMS. It's QPAs. I mean, I'm looking at the text of the statute. The statute says in subsection 2 that an IDR determination can be vacated or can be subject to judicial review when there's fraud. And if an insurer is affirmatively making a pattern of misrepresentations of its QPA, then that, we believe, would be fraud because it's a misrepresentation of a material fact. I think you would agree that merely alleging a miscalculation of a QPA isn't enough to get to fraud. You have to go beyond that. There would have to be fraudulent intent. We do believe that we have alleged that with respect to all of the insurers here, including, you know, and this is another point. I see I'm almost out of time. But, you know, with respect to Kaiser's overall pattern of providing QPAs to the IDR entity that were half of either QPA that they identified for us or, you know, at least equally misleading, they never said what their QPA was. They deprived us of that federally required disclosure and then went ahead and gave a lowball offer that we did allege and our complaint was lower than its real QPA. Thank you very much, Your Honor. You'll be back. The first case is submitted. Thank you, Ms. Taylor. We move seamlessly to Guardian Flight v. Healthcare Service Corporation.